# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | Civil No. 05-1656 (JRT/FLN) |
| Plaintiff, | |
| and | |
| MARIA TORRES, | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff-Intervenor, | |
| v. | |
| THE RESTAURANT COMPANY d/b/a Perkins Restaurant and Bakery, | |
| Defendant. | |

Deborah J. Powers, **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**, 310 West Wisconsin Avenue, Suite 800, Milwaukee, WI 53203, for plaintiff.

DeAundres D. Wilson, **WILSON LAW OFFICE, PA**, 100 West Franklin Avenue, Suite 204, Minneapolis, MN 55404, for plaintiff-intervenor.

Donald W. Selzer, Jr. and Jodie F. Friedman, **LITTLER MENDELSON, PC**, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402, for defendant.

The Restaurant Company, doing business as Perkins Restaurant and Bakery ("Perkins"), employed Maria Torres as a cook. On June 24, 2004, Torres filed a charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC subsequently filed this lawsuit against Perkins, alleging that Perkins violated Title VII of

the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, by subjecting Torres to sexual harassment and retaliatory discharge. Torres is a plaintiff-intervenor in this lawsuit. This matter is now before the Court on defendant's motion for summary judgment. For the reasons discussed below, the Court denies defendant's motion.

## BACKGROUND

Perkins owns restaurants in Minnesota, including two restaurants in which Maria Torres worked. In 2000, Torres was hired at the Perkins Riverside restaurant as a cook. In February 2003, Torres transferred to the Perkins Midway restaurant to continue her work as a cook. After Torres had been working at the Midway restaurant for several months, Mario Centeno was hired as the new Food Production Manager. As the Food Production Manager, Centeno was responsible for supervising cooks and other kitchen staff, and for the control and inventory of food. Centeno was Torres's direct supervisor, and he was primarily responsible for assigning her job duties and scheduling her hours.

Torres alleges that about two or three weeks after Centeno was transferred to the Midway restaurant Centeno began sexually harassing her. Torres alleges that Centeno frequently made sexual comments about her body and her appearance generally, and she provides specific examples. She also alleges that he repeatedly asked her to "go out" with him. (Torres Dep. 62-63.) Torres alleges that the unwelcome interactions with Centeno extended beyond the workplace. Specifically, Centeno appeared uninvited at Torres' home during a baptismal celebration for her son, and he commented at work that he wanted to take her out dancing in the same red dress she wore at the baptismal celebration. Torres alleges that Centeno's propositions were often accompanied by

comments of a sexual nature. For example, he suggested that they could "behave badly" together. (Torres Dep. 63.) The alleged harassment also included physical touching, such as repeatedly touching Torres's hand, grabbing her around the waist, and purposely brushing up against her when he passed by her.

Torres alleges that the harassment affected her ability to work. She alleges that the harassment made her feel stressed and upset, and that she suffered from headaches and a lost appetite. She further alleges that she was distracted from focusing on her work because she was constantly trying to think of ways to stop Centeno. She alleges that she felt humiliated when Centeno made sexual comments about her in front of her coworkers.

Torres alleges that when she refused Centeno's alleged sexual advances, he began treating her differently than other cooks. He did not allow her free soda, yelled at her, and closely scrutinized her comings and goings. Torres alleges that Centeno threatened to report her to immigration authorities, and told her that management would surely believe him over her.

Torres further alleges that Centeno told her "if you won't take it the good way, then it will be the bad way," and he increased her job duties. (Torres Dep. 66.) Specifically, Torres testified that she was the only cook required to fill, open, and clean both cooking lines instead of just the one on which she worked. She was further tasked with changing the fryers, taking meat out of the freezer, washing dishes, and helping the preparer. She also testifies that Centeno would give her the tickets for large parties, rather than just give her tickets in the order that they came up. She alleges that she had so much work that she had to forego bathroom breaks, and that Centeno did not allow other workers to help with her work when they offered.

Torres further alleges that she was denied a promotion because she refused Centeno's alleged sexual advances. Centeno testified that the promotion process is started when an employee tells the supervisor that the employee wants to be promoted. The supervisor then gives the employee a book to study that includes questions to answer about the job. Based on the score that an employee receives on these questions, the supervisor has a better idea of the employee's strengths and weaknesses and the supervisor can then initiate practical training. In October 2003, Torres told Centeno that she was interested in a promotion. Torres alleges that Centeno failed to provide her with a Spanish translation of the book, even though he knew she did not read English, and that he refused to offer her the practical training.

Torres alleges that she tried to avoid the alleged sexual harassment by repeatedly telling Centeno to stop the harassment and by telling him that she was married. She testifies that she did her best to avoid Centeno, and she asked other workers to stay close to her on the cooking line so Centeno would not stand next to her. After these strategies failed, Torres alleges that she shared her concerns with Maria Meraz, who was the shift leader. Meraz told Torres to speak with upper management about her concerns.

On Friday, April 2, 2004, Torres complained to Regional Manager Rick Walleen that Centeno had been sexually harassing her. Centeno was notified of the complaint later that day. On Saturday, April 3, 2004, Torres met with the General Manager of the Midway restaurant, Troy Smith. With the help of an interpreter, Torres told Smith the names of other female workers who might have information about the alleged sexual harassment. Torres testifies that Smith said that there were lots of cooks but not many kitchen managers, and explained to her that he was not going to fire or transfer Centeno.

At Smith's request, Torres submitted a written statement (in Spanish). As part of Perkins's investigation of the alleged harassment, Smith also received statements in Spanish from three of Torres's co-workers, and these accounts corroborate in part the treatment that Torres and other workers allegedly received from Centeno. When Torres met with Smith to give him her written statement, she explained that she did not tell Smith about the harassment earlier because Centeno had threatened to turn her into immigration authorities for being an undocumented alien.

When Centeno arrived at work on Saturday, April 3, 2004, Smith interviewed Centeno, and then told him to go home and stay away from Torres, and that they were investigating the complaint. Smith summarized the sexual harassment investigation for the Senior Human Resources Manager, Mark Kuehl. Smith explained that there were allegations that Centeno had asked women to go out dancing. He provided the written statements of Torres and her co-workers to Kuehl, but he did not include English translations. Smith testified that on Monday, April 5, 2004, Perkins management decided that Centeno would get a written warning. Smith also discussed with Walleen and Kuehl Torres's statement that she feared being reported to immigration officials. Kuehl testifies that he then called the Social Security Administration and learned that Torres's name did not match her social security number.

Torres attended another meeting with Smith on Monday, April 5, 2004. She alleges that at that meeting Smith told her that he would meet with upper management on Tuesday, April 6, 2004, and that they were planning on telling her that she no longer had a job because her immigration papers were inadequate. Smith also told her that if she was fired, she had to get another social security number under the same name and he

would rehire her. Smith allegedly told her to talk to a co-worker about how to get a new social security card.

On Tuesday, April 6, 2004, Centeno signed a written warning. The warning has a section entitled "What happened (specific facts)?" and it is written, "Employees alleging that you have been asking them out to socialize +/or to dance. They have asked you to stop, but it has continued." (Centeno Dep. Ex. 18.) In the section entitled "What should the employee do differently?," it is written, "Do not ask employees out to socialize. Be a professional manager and act appropriately." *Id.*

Several days after complaining about the sexual harassment, Torres alleges that Centeno cut her hours for the upcoming week. In previous weeks, Torres had always worked at least 80 hours over a two-week span. She alleges that she arrived on one of the days scheduled with shortened hours and asked if she could stay the full eight hours, but Centeno refused.

On Friday, April 9, 2004, Torres was called to a meeting with Kuehl, Smith, and Walleen. There was no interpreter present. According to Torres, the managers told her that she must punch out and that she could no longer work for Perkins. According to Perkins, Kuehl told Torres that she would be placed on a leave of absence until she returned with the proper documentation. After the meeting, Smith reminded Torres that he would hire her back if she got another social security card. Torres did not return to work.

## ANALYSIS

### I.  STANDARD OF REVIEW

Summary judgment is appropriate in the absence of any genuine issue of material fact and when the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.  TORRES'S STANDING TO PURSUE FEDERAL CIVIL RIGHTS CLAIMS

Defendant argues that Torres lacks standing to bring suit under the federal civil rights laws because she may be an undocumented alien.[1]  Defendant points to the Immigration Reform and Control Act ("IRCA"), which prohibits the employment of illegal aliens in the United States.  8 U.S.C. § 1324a.  Pursuant to IRCA, if an employer unknowingly hires an undocumented worker, the employer is compelled to discharge the employee upon discovery of the undocumented status.  8 U.S.C. § 1324a(a)(2).  Employers who violate IRCA are subject to civil fines and criminal prosecution.  8

---

[1] The Court has not permitted defendant discovery into Torres's immigration status.  *See* Docket Nos. 62 and 116.  For the purposes of this motion, the Court assumes that Torres is an undocumented alien.  The Court further notes that even if the Court were to conclude that Torres lacks standing to pursue her federal civil rights claims, there is no question that the EEOC could still pursue the claims.

U.S.C. §§ 1324a(e)(4)(A) and 1324a(f)(1). Defendant reasons that because the IRCA prohibits undocumented aliens from being employees, Torres is not a "person" or "employee" protected by Title VII.

Subsequent to the passage of IRCA, neither the United States Supreme Court nor the Eighth Circuit has addressed whether an undocumented alien has standing to bring suit under the federal civil rights laws. Defendants argue that IRCA changed the entire legal landscape applicable to the employment of unlawful aliens. *See Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137, 147 (2002) (explaining that IRCA "forcefully made combating the employment of illegal aliens central to the policy of immigration laws"). In *Hoffman Plastic*, the Supreme Court held that an undocumented worker was not entitled to back pay, even though the National Labor Relations Board determined that the employer committed an unfair labor practice against the employee. *Id.* at 145-152. The Court ruled that no monetary remedies are available under the National Labor Relations Act to unauthorized aliens because the unlawful discrimination would not have occurred but for the employee's unlawful submission of fraudulent work documentation. *Id.* at 150-52. Besides arguing that Torres lacks standing to pursue her claims, defendant uses *Hoffman Plastic* to further argue that Torres is not entitled to any form of damages that would not have accrued absent her initial misconduct that led to her being hired.

As for Torres's standing, the question boils down to whether *Hoffman Plastic* overruled *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973). *Espinoza* held that non-citizens are entitled to protections under Title VII. *Id.* at 94. The Supreme Court has recognized that Congress intended to empower individuals to act as private attorneys

general in enforcing the provisions of Title VII. *See N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 63 (1980) (finding that "Congress has cast the Title VII plaintiff in the role of 'a private attorney general,' vindicating a policy 'of the highest priority'"). Civil rights actions are necessary to forward the policies of Title VII, and a ruling that undocumented workers could not pursue civil rights claims on their own behalf would likely chill these important actions. The Court also considers the need to reduce employer incentives to hire undocumented workers because of their inability to enforce their rights. Every court that has considered the impact of *Hoffman Plastic* on Title VII either assumed or concluded that undocumented workers have standing in their own right to obtain relief. *See, e.g.*, *Riveria v. NIBCO, Inc.*, 364 F.3d 1057 (9th Cir. 2004). The Court therefore concludes that Torres has standing to pursue her federal civil rights claims.

It is possible that *Hoffman Plastic* precludes undocumented employees from pursuing certain remedies in discrimination cases. *See Riveria*, 364 F.3d at 1069. However, the Court need not decide this issue at this stage in the litigation. An employee's entitlement to certain remedies does not affect the determination of whether the employer engaged in discrimination.

### III. HOSTILE WORK ENVIRONMENT CLAIM

#### A. Severe And Pervasive Harassment

The Court first analyzes whether the alleged sexual harassment is actionable. Title VII establishes a "high threshold" that must be met before a harassment claim becomes actionable. *Duncan v. General Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002). A

claimant must prove that the alleged harassment was sufficiently severe or pervasive as to alter a term, condition, or privilege of employment. *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999). To establish "severe or pervasive" harassment, the "conduct must be extreme and not merely rude or unpleasant." *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005). Courts look to the totality of the circumstances to determine whether a hostile environment exists. *Bowen v. Missouri Dep't of Social Serv.*, 311 F.3d 878, 884 (8th Cir. 2002). This can include the severity of the acts, whether they were physically threatening or humiliating, and whether the conduct unreasonably interfered with the employee's work performance. *Id.*

Defendant argues that, as a matter of law, the sexual harassment alleged by plaintiffs does not amount to severe or pervasive harassment. The cases relied upon by defendant each hold that the alleged sexual harassment at issue was not actionable, but the holdings of these cases are highly dependant on the specific facts alleged in each case and can be distinguished from the circumstances at issue here. *Compare Henthorn v. Capitol Comm'n*, 359 F.3d 1021 (8th Cir. 2004) (holding not actionable allegations that the harasser asked out victim daily, told other employees victim was "hot," and called victim's home on multiple occasions), *with Williams v. City of Kansas City*, 223 F.3d 749 (8th Cir. 2000) (holding actionable allegations that harasser stared at victim's body, made sexual comments, said victim could have power through him, suggested they meet on weekends, and held private meetings). Plaintiffs allege that Centeno repeatedly made sexual comments, engaged in inappropriate touching, and arrived at Torres's home uninvited. Plaintiffs further allege that Torres was humiliated by Centeno's behavior and that it interfered with her ability to work. Based on these allegations, the Court concludes

that a reasonable jury could find that that harassment was severe and pervasive enough to constitute an actionable hostile work environment claim.

### B. Tangible Employment Action

The next question is whether the alleged sexual harassment culminated in a tangible employment action. If there is no tangible employment action, then a defendant may raise an affirmative defense to the sexual harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998).

Plaintiffs argue that defendant subjected Torres to two tangible employment actions as the result of the sexual harassment, namely, that Centeno assigned Torres additional work duties and denied her a promotion. The additional work duties included preparing two cooking lines instead of just the one on which she worked, changing the fryers, taking meat out of the freezer, washing dishes, helping the preparer, and being tasked with handling large orders. Defendant argues that the evidence does not show that the additional work duties and the denial of a promotion were the result of sexual harassment.

The Court need not address defendant's argument that the additional work duties were not a result of the alleged sexual harassment. Even if the extra duties were a result of the sexual harassment, the Court finds that the additional work duties given to Torres do not constitute a tangible employment action. Although the extra duties undoubtedly

made Torres's job more difficult for her, they do not amount to a "significant change in employment status." *Id*. The Court cannot construe the additional duties as "reassignment with significantly different responsibilities" because all additional duties were related to her job as a cook. *Id.*

As for the denial of the promotion, defendant points to testimony from Smith and Kuehl. Both indicate that Smith, not Centeno, had the ultimate authority for the granting or denial of promotions. Moreover, Perkins explains that because Torres did not finish studying the training book and answering the questions, Centeno properly prevented her from advancing to subsequent training areas. Plaintiffs do not dispute that Smith had the ultimate authority over the decision, but plaintiffs point to Centeno's own testimony that he was responsible for recommending Torres for promotion. The key question is whether the denial of her promotion was a result of the alleged sexual harassment. The answer to this question requires an inference from the evidence. This must be determined by a jury, and not by the Court on summary judgment.

### C.     The Affirmative Defense

There would be no need for the jury to decide whether the affirmative defense is available to defendant if defendant cannot as a matter of law establish the elements of the affirmative defense. The Court therefore next considers whether a reasonable jury could find that defendant met its burden to prove the affirmative defense. The affirmative defense has two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

Defendant promulgated an anti-harassment policy with a complaint procedure that was posted in the employee break room and distributed during new employee orientation. When defendant was made aware of the harassment, it promptly issued a written warning to Centeno. The Court concludes that a reasonable jury could find that defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior. *See id.*

As to the second element of the affirmative defense, defendant argues that Torres waited an unreasonably long time to report the harassment, and that the Court should therefore conclude that she unreasonably failed to take advantage of corrective opportunities. Plaintiffs argue that Torres did not report the harassment sooner because Centeno threatened to turn her over to immigration. It is true that an employee's subjective fears of retaliation do not alleviate the employee's duty to alert the employer to the harassment. *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005). However, plaintiff did ultimately file a complaint with upper management. The question is whether Torres's delay in reporting the harassment to upper management was unreasonable, and this is a factual dispute appropriately decided by a jury. *See, e.g.*, *Maple v. Publications Intern., Ltd.*, 2000 WL 1029112, *5 (N.D. Ill. 2000).

In sum, there are several jury questions that prevent judgment as a matter of law for defendant on the hostile work claim. The Court therefore denies defendant's motion for summary judgment as to this claim.

## IV. RETALIATION CLAIM

The *McDonnell Douglas* burden-shifting analysis applies to retaliation claims. To prevail on a retaliation claim, the plaintiff must first establish a prima facie case, consisting of evidence: "(1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Green v. Franklin Nat'l Bank*, 459 F.3d 903, 914 (8th Cir. 2006). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a non-retaliatory reason for the adverse employment action. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005). If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who is then obliged to present evidence that creates a question of fact as to whether defendant's reason was pretextual and creates a reasonable inference that defendant acted in retaliation. *Id.*

### A. Prima Facie Case

Defendant does not dispute that Torres engaged in protected activity when she complained to upper management about the alleged sexual harassment by Centeno. The Court therefore analyzes only the remaining two elements of the prima facie case. First, defendant argues that plaintiffs cannot establish that an adverse employment action was taken against Torres. An adverse employment action is established if a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2415 (2006).

Plaintiffs identify two possible adverse employment actions: Torres's work hours were reduced and she was terminated. As to the reduction in hours, defendant argues that Torres was not harmed by the reduction in hours because she left the company before she had to actually work the reduced hours. This argument is unpersuasive for two reasons. First, there is a dispute of fact as to whether Torres actually worked on a day when Centeno reduced her hours. Torres testifies that Centeno precluded her from working her normal hours on one day during the week of April 5, 2004, while defendant offers documentary payroll evidence to the contrary. Second, a plaintiff does not need to be actually harmed by the actions of a defendant to suffer an adverse employment action. The proper analysis is whether the challenged action might dissuade a reasonable employee from engaging in protected activity. *Id.* A reasonable jury could find that a threatened reduction in hours could satisfy that standard.

As to whether the termination of Torres qualifies as an adverse employment action, defendant argues that Torres was never actually terminated. Rather, defendant asserts that Torres was simply told that she could not continue to work at Perkins unless she submitted valid documents. Regardless of whether defendant actually terminated Torres, the Court concludes that a reasonable jury could find that defendant's action would deter a reasonable employee in Torres's situation from engaging in protected activity. Defendant emphasizes that its insistence on proper documentation was required under IRCA. However, whether defendant was simply complying with its duties under

IRCA or retaliating against Torres is a question about pretext, which does not bear on the existence of an adverse employment action.

Defendant also argues that Torres could not suffer an adverse employment action because, as an undocumented alien, she was not qualified for the job. Defendant cites no case law binding on this Court for this proposition. As discussed above, the Court relies in part on policy reasons to conclude that even if Torres is undocumented, she still has standing to pursue her Title VII claims. The same policy reasons prevent the Court from adopting the proposition that undocumented aliens are precluded from succeeding on Title VII claims simply because they are not qualified for employment.

Next, defendant argues that plaintiffs cannot establish a causal connection between Torres's complaint of sexual harassment and the adverse employment actions alleged. The temporal link between these events is very close. One week after Torres complained to upper management about Centeno's behavior, she was terminated, or at least told that she could not return without proper documentation. Close temporal proximity can support an inference of causation. *See Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105 (8th Cir. 2000). However, defendant argues that the presence of an intervening event discovered during the harassment investigation negates a finding of causal connection based on temporal proximity. Specifically, defendant asserts that it first learned of Torres's undocumented status during the harassment investigation. Plaintiffs offer evidence to the contrary, however. Torres testifies that Smith told her that he could not give her a raise because of her undocumented status, and that Centeno threatened to report her to immigration authorities. In addition, Smith testifies that Torres's personnel file only contained an alien registration form without a picture and a social security card,

which would be insufficient under the immigration laws.  Based on the contradictory evidence presented, the Court finds a material fact dispute as to whether defendant knew about Torres's status prior to the harassment investigation, and whether plaintiff can therefore establish a causal connection between her protected activity and the adverse employment actions.

### B. Pretext

The parties do not dispute that defendant has asserted a legitimate, non-retaliatory reason for the adverse employment actions, namely that Torres was an undocumented alien.  Certainly, plaintiffs do not disagree that defendant has an obligation to verify that its employees have proper work authorization documents.  However, plaintiffs argue that an employer cannot turn a blind eye to its employee's work authorization status, and then later use it as a pretext to terminate an employee when she complains about sexual harassment.  Therefore, the final question is whether defendant's articulated reason is pretextual.

Plaintiffs primarily rely upon the evidence in support of the prima facie case to establish pretext.  *See, e.g.*, *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) ("It is possible for strong evidence of a prima facie case to establish pretext as well . . . ."). As discussed above, the Court finds a material fact dispute as to whether defendant knew about Torres's immigration status prior to the harassment investigation. If a jury finds that defendant knew about Torres's immigration status prior to the harassment investigation, it could reasonably infer that defendant's proffered reason for the adverse employment actions was pretextual.

In sum, a reasonable jury could find that defendant retaliated against Torres for complaining of Centeno's alleged sexual harassment. The Court therefore denies defendant's motion for summary judgment on the retaliation claim.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 73] is **DENIED**.

DATED:   May 31, 2007                                       s/ John R. Tunheim
at Minneapolis, Minnesota.                                  JOHN R. TUNHEIM
                                                            United States District Judge